# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| NELSON VELAZQUEZ,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>OFFICE OF THE ILLINOIS SECRETARY<br>OF STATE, et al.,<br><br>　　　　Defendants. | No. 09 CV 3366<br>Judge James B. Zagel |

## MEMORANDUM OPINION AND ORDER

Before me is Plaintiff's motion for partial summary judgment on Count II and III of his complaint, and Defendants' cross-motion for summary judgment on all counts. I am ordering further briefing from both parties on whether Count One is barred by 28 U.S.C. § 1738. On Count II, I find that Plantiff's procedural due process rights were violated but order further briefing on whether Defendants are entitled to qualified immunity. Both Plaintiff's motion and Defendants' cross motion for summary judgment on Count III are denied.

## I. FACTUAL BACKGROUND

Plaintiff Nelson Velazquez began work as a police officer at the Illinois Secretary of State ("ISOS") Department of Police on September 27, 1990. Over the next eighteen years Velazquez was steadily promoted through the ranks, reaching the position of Investigator-Lieutenant on January 31, 2007. On September 25, 2007, the Director of the ISOS, Defendant Brad Demuzio, telephoned Plaintiff and advised him that he (Demuzio) and Defendant Mike Pippin, who at the time was Captain of the ISOS, wanted to meet with Plaintiff the following day in Springfield to discuss improvements to a vehicle inspection program that Plaintiff worked on. The proposed

meeting was a pretense. The true reason why Defendants wanted to meet with Plaintiff was to further an ongoing investigation of fraudulent record keeping by ISOS officers, of which Plaintiff had become a subject. Specifically, Plaintiff was suspected of inflating his hours on time sheets submitted under the Speeding Traffic Accident Reduction Program ("STAR"), a federally funded hire-back program. Demuzio, Pippin, and Defendant Steven Nash, an investigator with the Illinois Inspector General's office, wanted Plaintiff to come down to Springfield so that he could be questioned by state and federal law enforcement officials and placed on leave for the remainder of the investigation.

On September 26, 2007, Plaintiff drove from Chicago to Springfield, arriving at the Department of Police command center around 10:00 am. The precise details of what happened next are disputed but basically Defendant Pippin met Plaintiff somewhere on the command center grounds, relieved Plaintiff of his firearm and keys to his Secretary of State vehicle, and drove Plaintiff to the nearby Office of the Inspector General (OIG). When Plaintiff arrived at the OIG he was escorted to a conference room where two individuals introduced as FBI agents were waiting to interview him. Plaintiff was told to be seated and the conference room door was closed behind him. The FBI agents interviewed Plaintiff for roughly 45 minutes. None of the individual Defendants were present during Plaintiff's interview with the FBI. Plaintiff alleges that the FBI agents failed to issue him *Miranda* warnings, did not advise him of his right to speak with an attorney, and made several statements suggesting Plaintiff was going to go to jail.[1]

---

[1] The fact that Plaintiff was never read his *Miranda* warnings probably cuts in favor of Defendants' argument that he was not arrested. Regardless, no *Miranda* violation took place here since none of Plaintiff's statements or any evidence derived therefrom was introduced against him at a criminal trial.

After the FBI's interview Defendants Pippin and Nash entered the conference room to interview Plaintiff. The parties dispute whether Plaintiff was advised of his *Garrity* rights or told that his interview with Defendants was administrative rather than criminal. Defendants did not inform Plaintiff that he was free to leave the interview at any time. The substance of the interview is also largely disputed. Defendants claim they presented Plaintiff with documents that revealed discrepancies in his paperwork and offered him an opportunity to respond, at which time Plaintiff stated any errors were attributable solely to "sloppy paperwork." Plaintiff denies that he was shown any documents or other evidence against him, but he acknowledges he said something to the effect of any errors being attributable to "sloppy paperwork."

Perhaps most importantly, the parties dispute the general tone of the interview. Indeed, even the word "interview" is contentious here because Plaintiff describes it more as a criminal interrogation. The precise facts of this confrontation between Plaintiff and Defendants Pippin and Nash are critical; they go to the heart of Count Three for unlawful seizure and significantly color Plaintiff's procedural due process claim. The unresolved issues surrounding the nature of the interview and the way in which they affect the disposition of Plaintiff's claims will be discussed in greater detail below.

At the close of the interview, Pippin handed Plaintiff a letter dated September 26, 2007, from the Secretary of State Director of Personnel, Defendant Stephan J. Roth. The letter advised Plaintiff that he was "being placed on a Leave of Absence with pay effective at the end of business on September 26, 2007, pending the results of an internal investigation." The letter further advised that the leave status would be maintained "for a maximum of 90 days or until such time as the internal investigation has been completed and reviewed by the Department of

Police." The letter did not provide notice of the reason for the investigation, nor did it describe any ways in which Plaintiff could obtain information about the investigation or have an opportunity to be heard. In fact, the letter stated that during the leave of absence Plaintiff was "not permitted on Secretary of State grounds except for personal business." The sole recourse the letter provided Plaintiff was a right to "speak with a representative from the Department of Personnel's Employee Benefits and Records Division or Payroll."

For the next two months, Plaintiff remained on a leave of absence with pay. Defendants had no further communication with Plaintiff until November 19, 2007, when Defendant Roth sent Plaintiff a letter advising him that as of November 16, 2007, Plaintiff's status was changed to leave of absence without pay. Like the September 26th letter, this letter did not include any written notice of the subject matter of the investigation, nor did it explain to Plaintiff how he might obtain a hearing. Plaintiff did not hear anything from Defendants for the next five months. Then, on April 17, 2008, Defendant Roth sent a letter to Plaintiff advising him that he was being suspended pending discharge. This letter provided the first written notice of the charges filed against Plaintiff in relation to his discharge and advised him that he had the opportunity to present a written rebuttal. Finally, on April 30, 2008, Defendant Roth sent a letter to Plaintiff advising him that his employment with the Secretary of State had been terminated based on the charges laid out in the April 17 letter, and that he had the right to appeal his discharge to the Secretary of State Merit Commission.

Plaintiff exercised his right to appeal and on October 6 and 7, 2008, following extensive discovery between the parties, hearings were held before the Secretary of State Merit Commission. Plaintiff testified and also questioned witnesses, including Defendants Nash,

Pippin and Demuzio. On December 17, 2008, the Commission upheld Plaintiff's discharge. Plaintiff then filed a complaint for administrative review in the Circuit Court of Cook County. On June 3, 2009, before the Circuit Court of Cook County had conducted its administrative review, Plaintiff filed the complaint in this case. On January 7, 2010, the Circuit Court of Cook County held a hearing and confirmed the Merit Commission's ruling.

**II. PRELIMINARY ISSUES**

Before I reach the merits of Plaintiff's claims, there are several procedural issues to address. Defendants claim that Plaintiff's lawsuit is "barred by the *Rooker-Feldman* doctrine and/or res judicata and/or collateral estoppel because they are simply a rehashing of claims already decided by the Merit Commission and the Circuit Court of Cook County." I discuss each issue in the order in which Defendants raise them.

A.  *Rooker-Feldman* Doctrine

The *Rooker-Feldman* doctrine stands for the basic principle that federal district courts may not exercise appellate jurisdiction over state-court judgments. The doctrine is limited to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Co. v. Saudi Basic Industries Co.*, 544 U.S. 280, 284 (2005). It is not applicable in this case because there was no state-court judgment at the time this lawsuit was filed. Thus, Plaintiff could not possibly be "inviting" this court to review and reject a state-court ruling. *See Exxon Mobil*, 544 U.S. at 294. Although the Merit Commission had reached a determination, *Rooker-Feldman* does not apply to determinations made by state administrative agencies. *Verizon Md. Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 644, n.

3 (2002). The fact that the state court had not issued a judgment at the time Plaintiff filed this lawsuit distinguishes this case from *Manley v. City of Chicago*, 236 F.3d 392 (7th Cir. 2001).

B.   Res Judicata

Res judicata is an equitable principle that refers to "the preclusive effect of a judgment in foreclosing litigation of matters that were or could have been raised in an earlier suit." *LaSalle Nat'l Bank of Chicago v. DuPage*, 856 F.2d 925, 930 n. 2 (7th Cir. 1988). The essential elements of res judicata are (1) an identity of parties or their privies; (2) an identity of causes of action in the earlier and in the later suit; and (3) a final judgment on the merits in the earlier suit. *Id.* at 931. Under 28 U.S.C. § 1738, federal courts are statutorily required to give state-court judgments the same res judicata effect they would have in the courts of the state in which they were issued. 28 U.S.C. § 1738. In Illinois, res judicata "applies to *every question relevant to and falling within the purview of the original action*, in respect to matters of both claim or grounds of recovery, *and defense*, which could have been presented by the exercise of due diligence." *Hughey v. Indus. Comm'n*, 394 N.E.2d 1164, 1166 (1979) (emphasis in original).

While unreviewed state administrative proceedings do not necessarily have preclusive effect on claims brought in federal court, *see e.g. University of Tennessee v. Elliott*, 478 U.S. 788 (1986), once those proceedings are affirmed by a state-court judgment, 28 U.S.C. § 1738 is triggered. *See Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 476 (1982). This, in turn, leads to a two-prong inquiry: "(1) whether the law of the state in which the prior judgment is rendered would give that judgment preclusive effect against the claims asserted in the federal action; and (2) whether the party against whom preclusion is asserted had a full and fair opportunity in the

6

state proceedings to litigate the claims (i.e. whether the state proceedings satisfy minimum due process requirements)." *Welch v. Johnson*, 907 F.2d 714, 719 (7th Cir. 1990).

Plaintiff argues that his Title VII claim is not precluded because he did not receive authorization from the United States Department of Justice to file suit until after he filed his complaint for administrative review in the Circuit Court of Cook County.[2] Thus, he argues, he could not have consolidated his Title VII claim with his appeal to the Merit Commission or his complaint for administrative review in state court. This argument fails. In Illinois, a party's failure to raise an available defense in the original action precludes that party's ability to bring a later suit against the same opponents based on the same set of operative facts as the omitted defense.[3] *Id*. at 721.

From the record before me, it does not appear that Plaintiff even attempted to raise the issue of race discrimination before the Merits Commission or in state court. Regardless, the only way his Title VII complaint can now be raised in federal court is if he can demonstrate manifest injustice, *see Benton v. Smith*, 510 N.E.2d 952, 957-58 (1987), or that he was denied a full and fair opportunity to litigate his discrimination claims in the state proceedings. *Welch*, 907 F.2d at

---

[2]Plaintiff's arguments as to why his Title VII claim is not precluded are entirely procedural. This, I presume, is because he recognizes that the substantive elements of res judicata–identity of parties, identity of claims, and a final judgment on the merits–are satisfied. As in *Welch*, Plaintiff's Title VII claim and the state suit are "merely different factual sides of the same coin." 907 F.2d at 722.

[3]Plaintiff argues that the Seventh Circuit "appears to have adopted the prevailing rule that res judicata does not bar a subsequent lawsuit for issues that arise after the operative complaint is filed." While this may be a correct statement of law, it misses the mark entirely. In this context, the issue "arises" when the operative set of facts actually occur, not when a cause of action becomes available. In other words, Plaintiff did not need Justice Department authorization to argue to the Merits Commission or the state court that he was discriminated against based on race.

714. Both sides make conclusory statements on the full and fair opportunity question; I want facts. I am ordering further briefing from both parties on this specific issue.[4]

As for Counts II and III, I am unpersuaded by Defendants' assertion that the events of September 26, 2007, and Plaintiff's subsequent termination constitute a single transaction. In this case, the "proof" approach–also widely used by Illinois Courts–is more useful than the transactional approach in determining what constitutes a single cause of action for res judicata purposes. Under the "proof" approach, two suits are considered to involve the same cause of action if the same evidence would sustain both actions. *See LaSalle*, 856 F.2d at 931. In this case, the evidence that Plaintiff would offer to establish his Section 1983 claims is not the same evidence that he could have offered to the Merit Commission or the Circuit Court as a defense to the charges that led to his termination. *See Welch*, 907 F.2d at 721. My November 2, 2009 ruling that res judicata does not bar Count II stands, and I extend that reasoning to Count III.

C.     Collateral Estoppel

28 U.S.C. § 1738's "full faith and credit" requirement also encompasses the equitable principle of collateral estoppel. Generally, collateral estoppel prohibits the relitigation of any settled issue that was necessary to a prior final judgment. Under Illinois law, collateral estoppel applies where: (1) the issue decided in the prior adjudication is identical to the issue presented in

---

[4]Plaintiff carries the burden of proof here. In *Welch* the Seventh Circuit held that the Illinois Civil Service Commission (CSC) offers employees a full and fair opportunity to litigate discrimination claims during termination proceedings. 907 F.2d at 724. For his Title VII claim to go forward, Plaintiff must meaningfully distinguish the Secretary of State Merit Commission's termination proceedings from the CSC proceedings. Alternatively, his Title VII claim will survive if he can produce evidence showing that he attempted to raise his discrimination claim but was blocked by the Merit Commission or the state court, as in *Jones v. City of Alton*, 757 F.2d 878 (7th Cir. 1985).

the present suit; (2) a final judgment was entered on the merits in the prior adjudication; and (3) the party against whom estoppel is asserted was a party to or in privity with a party to the prior adjudication. *Gumma v. White*, 833 N.E.2d 834, 843 (2005). Collateral estoppel does not apply in this case because there is no evidence that any issues Plaintiff raises in this suit were actually litigated in state proceedings. The fact that Plaintiff's current claims *could have* been raised is relevant for res judicata purposes, not collateral estoppel.

### III. STANDARD OF REVIEW

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The facts presented are to be construed in a light most favorable to the nonmoving party. *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001). Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-324 (1986).

### IV. DISCUSSION

A. <u>Count II: Procedural Due Process</u>

In Count II of his complaint, Plaintiff alleges that he was deprived of a protected property interest in his job without due process of law. To state a Fourteenth Amendment procedural due process claim based on the deprivation of a property interest, Plaintiff must make a three-part showing: (1) he had a constitutionally protected property interest; (2) he suffered a loss of that

9

interest amounting to a deprivation, and (3) the deprivation occurred without due process of law. *LaBella Winnetka, Inc. v. Village of Winnetka*, 628 F.3d 937, 943-44 (7th Cir. 2010).

State law determines what is "property" protected under the Fourteenth Amendment. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 538 (1985) Under Illinois law, public employees generally do not have property rights in employment which trigger due-process protections. *Levin v. Civil Serv. Comm'n of Cook County*, 52 Ill.2d 516, 521 (1972). However, a property right in public employment can be created through statutes or ordinances that "provide some substantive criteria limiting the state's discretion" in employment decisions, such as a requirement that employees can only be dismissed "for cause." *Miyler v. Village of East Galesburg*, 512 F.3d 896, 898 (7th Cir. 2008). The Supreme Court has held that civil service statutes defining the terms of public employment can create protected property rights when such statutes include discretion-limiting language. *See Loudermill*, 470 U.S. 532.

Given the above framework, I find that Plaintiff had a constitutionally protected property right in continued employment as an ISOS police officer. The Secretary of State Merit Employment Code includes the very type of discretion-limiting language that the Supreme Court has found sufficient to create a protected property interest. Specifically, the code provides that "no certified officer or employee....shall be removed, discharged or demoted, or suspended for a period of more than 30 calendar days, *except for cause*, upon written charges approved by the Director of Personnel, and after an opportunity to be heard in his own defense if he makes written request to the Commission within 15 calendar days after the serving of the written charges upon him." 15 ILCS 310/9. This language gave Plaintiff a "legitimate claim of entitlement" to continue in his job. *Miyler*, 512 F.3d at 898.

Defendants argue that even if the Secretary of State Merit Employment Code on its face gave Plaintiff a protected property interest, the Secretary of State Policy Manual effectively disclaims this interest. Specifically, Defendants point to language in paragraph three of the June 1, 2004 policy manual revisions signed by the Plaintiff. That paragraph states, in full:

> I further understand that the policies set forth are neither intended nor shall be construed either to expand upon *or to limit* any rights I may have under the Secretary of State Merit Employment Code and the Department of Personnel Rules and that nothing in this Policy Manual creates any contract of employment nor any guarantee of any terms or conditions of employment.

(emphasis added). It is difficult to see how a policy manual that explicitly states it has no limiting effect on "any rights [Plaintiff] may have under the Secretary of State Merit Employment Code" could effectively disclaim any property interest in continued employment created by the discretion-limiting language of the code. This argument fails.

The next question is whether Plaintiff suffered a deprivation. Defendants do not dispute that suspension without pay amounts to a deprivation that would trigger due process protections. But they argue that Plaintiff was not entitled to any further process because he was put on a "leave of absence,"–first with pay and later without–not suspended. This argument is unavailing. The deprivation at issue here is loss of salary and, as Defendant Roth admitted in his deposition, for this purpose it makes no difference whether in Defendants' eyes Plaintiff was suspended, furloughed, put on leave or took an extended vacation. All that matters is, against his will and without any procedural protections, his paycheck was suddenly cut off. I find that discontinuing Plaintiff's salary from November 16, 2007, the day he was put on leave without pay status, to April 30, 2008, the date he was terminated, amounts to a deprivation of constitutionally protected

11

property. *See FDIC v. Mallen*, 486 U.S. 230, 240 (1988) (holding that suspension constitutes deprivation and triggers due process protections).

The final question is whether this deprivation occurred without due process of law. Again, Defendants argue that Plaintiff was not entitled to any further process because he was not technically suspended. This argument reflects a fundamental misunderstanding of constitutional procedural due process law. As Plaintiff succinctly put it in his brief, "State law defines property; federal law defines the process that is due." Just as failure to follow state procedural rules does not condemn a defendant under the federal due process clause, *Miyler* at 899, nor does pedantic adherence to state policies shelter the defendant. Once it is determined that a deprivation of a protected property interest has occurred, state law and policy are no longer relevant. Constitutional protections have been triggered and federal law controls. *See Loudermill*, 470 U.S. at 541-42.

"An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Id*. at 542. (Quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950). Notice and hearing "must be granted at a meaningful time and in a meaningful manner." *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972). Nevertheless, "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrisey v. Brewer*, 408 U.S. 471, 481 (1972). To determine what process is constitutionally due, courts generally balance three distinct factors: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest." *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976).

Pre-deprivation process is not required in limited situations "demanding prompt action [that] justif[ies] postponing the opportunity to be heard until after the initial deprivation." *FDIC*, 486 U.S. at 240. In such cases the state must demonstrate "an important government interest, accompanied by a substantial assurance that the deprivation [was] not baseless or unwarranted" to satisfy due process requirements. *Id*. *See also Barry v. Barchi*, 443 U.S. 55, 64-65 (1979).

Defendants can demonstrate neither an important government interest nor substantial assurance against baselessness in depriving Plaintiff of his paycheck for five months. While removing the Plaintiff from his work during the pendency of the investigation to prevent further misappropriation of federal funds surely served an important government interest, this interest was not furthered by switching Plaintiff from leave with pay to leave without pay before affording him any kind of process. *See Loudermill*, 470 U.S. at 544-45 ("in those situations where the employer perceives a significant hazard in keeping the employee on the job, it can avoid the problem by suspending with pay."); *but see Gilbert v. Homar*, 520 U.S. 924, 932 (1997) (suspension with pay not required where adequate independent assurances, such as arrest and formal filing of felony charges, provide reasonable grounds to believe charges against employee are true.)

Further, in the cases in which the Supreme Court has upheld the denial of pre-deprivation process, the defendants, in denying that process, acted in conformity with state or federal law. *See Barry*, 443 U.S. 55 (assessing constitutionality of state law requiring interim suspension of horse trainers' licenses when probable cause exists to believe that a horse has been drugged and the trainer was at least negligent in connection with the drugging); *Mallen*, 486 U.S. 230 (assessing constitutionality of federal statute allowing for suspension without hearing of private bank employees who are criminally indicted). In determining the validity of these laws from a

13

procedural due process standpoint, the Supreme Court essentially deferred to the legislatures' determination that certain government interests were so important that they outweighed the individual interest in obtaining pre-deprivation process. Here, we have the opposite situation. The Secretary of State Merit Employment Code reflects a determination by the Illinois legislature that the individual property interest in continued employment trumps competing state interests once the 30-day suspension mark has passed. 15 ILCS 310/5. I likewise defer to the legislature on this point.

Even if Defendants could demonstrate an important state interest, the deprivation of Plaintiff's pay was not accompanied by adequate assurances against baselessness. It may very well be the case that by the time they suspended Plaintiff, Defendants had compiled so much evidence against him that there was no doubt in their minds of his guilt. But without some independent corroboration of that evidence, the third prong of the *Mathews* balancing test–risk of erroneous deprivation–would be rendered meaningless. In other words, absent a legislative determination to the contrary, the state actor imposing the deprivation cannot be the sole determiner that existing evidence is sufficiently reliable to allow for withholding of basic pre-deprivation procedural rights without significant risk of error. *See Barry*, 443 U.S. at 64 (physical drug test by expert following prescribed testing procedures provides adequate assurance); *Mallen*, 486 U.S. at 245 ("the finding of probable cause by an independent body demonstrates that the suspension is not arbitrary"); *Gilbert*, 520 U.S. at 933-34 (arrest and filing of charges provides reasonable grounds to believe charges are not baseless). There was no such independent verification in this case, and this tips the *Mathews* scales decidedly in Plaintiff's favor.

Defendants claim that their September 26, 2007, "administrative interview" of Plaintiff provided him all the notice and opportunity to be heard that due process requires. I reject this argument. First, Plaintiff was blind-sided by the charges after being ordered down to Springfield under pretense. Thus, he was not given any notice or opportunity to prepare the type of defense that would be necessary for a meaningful hearing. Second, Plaintiff could have reasonably believed that he was being arrested, particularly after his interview with the FBI agents. Whatever the precise facts, it is clear that the interview at least resembled a criminal interrogation. Such an interrogation-like setting, as described here, did not provide "meaningful" opportunity to be heard. Third, generally "meaningful" hearings can only be had in front of a neutral, impartial arbiter of the facts. *Schweiker v. McClure*, 456 U.S. 188, 195 (1982). If this were to have been the hearing with respect to specific accusations, the investigating officers who made the allegations are not impartial arbiters. Fourth, Plaintiff was not provided with written notice of the charges against him until April 17, 2008–five months after the deprivation began. Written notice is a fundamental due process right and there is no justification for Defendants' failure to provide such notice up front, let alone the five-month delay.

Based on the above analysis, I find the Plaintiff's procedural due process rights were violated.

Qualified Immunity

Defendants argue that they are entitled to qualified immunity on the procedural due-process claim. Qualified immunity shields state and federal officials from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Since I have already determined that Plaintiff's procedural due process rights have

15

been violated, the only question remaining is whether, at the time of the violation, it was *clearly established* that the specific conduct alleged–depriving Plaintiff of his salary and failing to provide him with any form of written notice or opportunity to be heard until five months after the deprivation began–violated Plaintiff's Fourteenth Amendment rights. *Saucier v. Katz*, 533 U.S. 194 (2001). Here, the key inquiry is whether, given the state of the law in November 2007, Defendants had "fair warning" of the unconstitutionality of their conduct. *United States v. Lanier*, 520 U.S. 259, 270-71 (1997).

Neither party has adequately briefed this issue. I am therefore ordering further briefing on whether the unconstitutionality of Defendants' conduct vis-a-vis Plaintiff's procedural due process rights was clearly established in November 2007. In briefing this issue, the parties would be wise to frame their arguments around *Davis v. Scherer*, 468 U.S. 183 (1984), and the most recent Supreme Court cases on fact-specificity requirements, including *Lanier*, 520 U.S. 259, and *Hope v. Pelzer*, 536 U.S. 730 (2002).

B.  Count III: Unlawful Seizure

In Count III of his complaint, Plaintiff alleges that his Fourth Amendment right to be free of unreasonable searches and seizures was violated when he was told to come down to Springfield under false pretenses and taken to the Office of the Inspector General's office for questioning. Defendants argue that Plaintiff was never "seized" under the Fourth Amendment, and even if he was Defendants are entitled to qualified immunity. Because several genuine disputes of material fact exist over whether Plaintiff was unreasonably seized, I find that neither party is entitled to summary judgment on Count III. *See Driebel v. City of Milwaukee*, 298 F.3d 622, 652 (7th Cir. 2002).

16

In denying summary judgment, I find the Seventh Circuit's opinion in *Driebel* to be particularly instructive. 298 F.3d 622. As Defendants rightly note, the facts surrounding one of the plaintiffs in that case, Officer Huston, are very similar to those alleged by Plaintiff. Huston was under investigation by the Internal Affairs Division (IAD) of the Milwaukee Police Department for misconduct in public office. *Id*. at 633. After setting up a sting operation in which Huston was implicated, an IAD detective ordered Huston to accompany him to police headquarters. The IAD detective drove Huston to police headquarters and escorted him to an empty room on the IAD floor. *Id*. at 634-35. The detective sat with Huston in the empty room for approximately three hours, during which time he informed Huston that he was the subject of a criminal investigation and denied Huston's repeated requests to speak with a lawyer or a union representative. Huston was allowed to use the restroom but only with a detective accompanying him. *Id*. at 635.

After three hours had passed, another IAD detective entered the room and read Huston his *Miranda* rights. Huston then requested an attorney and a union representative and refused to make any further statements. *Id*. A few minutes later, Huston was told to return back to the Gang Squad, where he was regularly assigned, for the remainder of his shift. Huston received compensation for his duty hours that day, including time spent with the IAD detectives, and was never relieved of his police issued credentials or weapon. *Id*. at 635. However, several critical facts were missing from the record, including what was discussed during the three hours in which Huston waited with the IAD detective before being read his *Miranda* rights, whether the door to the IAD office room was open or shut, locked or unlocked, and whether any IAD detective ever put his hands on Huston during the encounter. *Id*. at 634-635.

17

The Seventh Circuit granted summary judgment in favor of the defendant on Officer Huston's Fourth Amendment claim, finding that the record was too sparse to establish that he was "seized." *Id*. at 646. However, the court emphasized that it was a "close call" in spite of the "meager record," and that "officers with a more complete record in future cases might very well avoid the entry of summary judgment against them." *Id*. Specifically, the court stated that summary judgment could have been avoided if the record contained evidence to establish whether Huston had been: "(1) physically touched or 'separated' from his partner; (2) placed in a locked room; (3) relieved of his weapons; (4) confronted by armed officers; (5) questioned by officers using a menacing tone of voice or making coercive statements; (6) explicitly denied a request to leave or told he was not free to leave; (7) treated in a manner that differs from standard [agency] guidelines or customs for questioning police officers." *Id*. at 649 n. 16.

In this case, the record contains enough of these facts to avoid summary judgment. It is undisputed that Plaintiff was relieved of his weapon when he arrived at the Department of Police command center in Springfield. Additionally, unlike in *Driebel*, we know that the door to the room in which Plaintiff was interviewed was closed behind him, suggesting his ability to leave was restricted. There is no evidence that Plaintiff was physically touched, nor whether the FBI agents or Defendants Pippin and Nash were armed during their interviews with Plaintiff. There is also a dispute over whether the officers used a "menacing tone" or threatened Plaintiff with prison time. These are precisely the kinds of factual disputes that a jury should determine.[5]

---

[5]Defendants do not argue that they did in fact have probable cause to arrest Plaintiff. Both parties may want to take another look at this issue and provide further briefing.

Qualified Immunity

It is clearly established that the seizure of a police officer in the context of a criminal investigation requires probable cause. *Id*. at 651. Thus, if in fact Plaintiff was seized as part of a criminal investigation without probable cause, Defendants are not entitled to qualified immunity. *Id*. On the other hand, a police officer may be subject to limited forms of search and seizure based only on reasonable suspicion for internal investigations. *Id*. at 652.

Defendants claim that Plaintiff's September 26, 2007, interview with the FBI agents and Defendants Pippin and Nash was strictly part of an internal investigation and thus, even if Plaintiff was seized, Defendants did not need probable cause. Plaintiff argues that the facts surrounding the interview suggest it was part of a criminal investigation. I find that there is a genuine issue of material fact about whether Plaintiff's interview was criminal or administrative in nature–the totality of the circumstances does not point conclusively enough in either direction to resolve the issue at this stage. *Id*. at 640 n. 9. If a jury finds that the FBI or any of the Defendants were there, at least in part, to gather evidence for a criminal prosecution, then probable cause was needed to effect a seizure and the defense of qualified immunity would be off the table.[6] *See U.S. v. Taketa*, 923 F.2d 665 (9th Cir. 1991) ("The [government employer] cannot cloak itself in its public employer robes in order to avoid the probable cause requirement when it is acquiring evidence for a criminal prosecution."). If, on the other hand, a jury determines that the interview was administrative in nature, Defendants will not only be held to a lower

---

[6] I see no other way to read *Driebel*, 298 F.3d 622. There, the Seventh Circuit also ruled out the defense of qualified immunity for the four officer-defendants since it was clearly established that "police are not relegated to a watered-down version of constitutional rights," and instead focused on the factual basis for the substantive constitutional violation. *Id*. at 640 ("The issue, then, becomes whether the [plaintiffs] were seized without probable cause.").

19

substantive standard for effecting a seizure (reasonable suspicion) but may also be entitled to qualified immunity. *Driebel*, 298 F.3d at 652. It is therefore up to a jury to determine whether the September 26, 2007 interview was administrative or criminal in nature before this court can make an informed ruling on qualified immunity as to Count III.

## V. CONCLUSION

For the foregoing reasons, I am ordering further briefing on whether Count I is barred by 28 U.S.C. § 1738. As to Count II, I find that Plaintiff's procedural due process rights were violated and order further briefing on whether Defendants are entitled to qualified immunity. Both sides' motions for summary judgment on Count III are denied.

ENTER:

James B. Zagel
United States District Judge

DATE: December 14, 2011